**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| DONAT RICKETTS,<br>Plaintiff,<br><br>v.<br><br>CBS CORPORATIONS, et al.<br>Defendants. | CV 19-03895 DSF (MRWx)<br><br>Order GRANTING Motion for Judgment on the Pleadings (Dkt. 55) and Striking Docket Nos. 77, 87, and 106 |

Defendants CBS Corporation (erroneously sued as CBS Corporations), CBS Studios Inc. (erroneously sued as CBS Television), Makenna Productions, Inc. (formerly known as Berlanti Television, Inc. and erroneously sued as Berlanti Productions, LLC), Warner Bros. Television (erroneously sued as Warner Brother's Television), The CW Network, LLC (erroneously sued as CW Network), Netflix, Inc. (erroneously sued as Netflix), Rob Hardy, April Blair (erroneously sued as April Blaire), and Spencer Paysinger move for judgment on the pleadings. Dkt. 56 (Mot.). Plaintiff opposes. Dkt. 87-7 (Opp'n).[1] The Court deems

[1] Plaintiff's submissions are somewhat confusing. First, Plaintiff submitted two (apparently identical) memoranda and points of authority in opposition to Defendants' motion. See Dkts. 86, 87-1. In both documents, the caption page is after the table of contents and the table of authorities, and the caption states that these documents are Plaintiff's opposition to Defendants' motion, but also "in the alternative" a "Motion for Summary Judgment." Dkt.

this matter appropriate for decision without oral argument. See Fed. R. Civ. P. 78; Local Rule 7-15.

## I. FACTUAL BACKGROUND[2]

Plaintiff is an independent filmmaker, producer, and actor. Dkt. 14 (FAC) ¶ 7. In 2013, Plaintiff first introduced the character

---

87-1 at 9. Yet, there is no notice of motion or declaration that a meet and confer occurred pursuant to Local Rule 7-3. Nor is there any reference in the documents themselves to summary judgment. Further, Plaintiff filed a "Notice of Opposition," but that notice does not mention summary judgment. Dkt. 87-1. Plaintiff also submitted a combined "Request for Judicial Notice" and "Statement of Uncontroverted Facts and Conclusions of Law." Dkt. 84. It is unclear from the above whether Plaintiff intended to move for summary judgment. Nevertheless, Plaintiff has failed to properly do so. In addition, Plaintiff filed a document called "Plaintiff's Tentative and *Demand* for Oral Argument." Dkt. 106. (The actual title on the document is different from the title indicated on the docket.) This document appears to be a "sur-reply" filed contrary to Local Rule 7-10 which requires a "prior written order of the Court" for "the opposing party" to "file a response to the reply." The Court strikes this document. Defendants also move to strike Plaintiff's non-opposition to Defendants' request for judicial notice (Dkt. 77) and Plaintiff's notice of opposition (Dkt. 87) on the ground that they are "vehicles for Plaintiff to submit additional argumentation in direct violation of the 37-page limit imposed by the Court." Dkt. 105 (MTS) at 2. The Court agrees and GRANTS Defendants' Motion to Strike these documents. Plaintiff also appears to request the Court treat the motion as a motion for summary judgment. See Dkt. 106-1 at 2; Dkt. 106-2 at 1. The Court declines to do so.

[2] Plaintiff submitted four declarations and thirteen exhibits in support of his opposition. Dkts. 78-81. Defendants object to these documents "on the ground that they incorporate or reference extraneous materials that are not relevant to the determination of the legal issues . . . and therefore are not properly considered by the Court." Dkt. 104 (Objs.) at 2. Defendants note that a motion for judgment on the pleadings is "based on the factual allegations contained in the challenged pleading . . . and evidentiary matters outside the pleadings are not relevant to that determination." Id. at 3. The Court agrees and does not consider this evidence. See Hal Roach Studios,

Blake in a Web Series called "Vignettes" and then further developed his character in "Awkward Moment." Id. ¶ 26. Plaintiff also created a Business Plan, which was later revised because of the Black Lives Matter movement. Id. ¶ 32. In July 2013, Plaintiff attended a workshop with Fern Orenstein, the Vice President of Casting for Diversity at CBS Studios. Id. ¶¶ 29, 55. Plaintiff also sent Orenstein, and other employees of Defendants, copies of Vignettes and Awkward Moment. Id. ¶¶ 30, 55. In 2015, Plaintiff released a television script called "Blake's World" that was later turned into a film and released as "Blake's World: Demo Reel." Id. ¶¶ 32, 35, 37. Plaintiff sent postcards promoting Blake to Defendants' employees, and also spoke with Leslie Moonves, then CEO and President of CBS Corporation, over the phone. Id. ¶¶ 39-42, 57, 59, 63, 69. Plaintiff also attended a workshop with "business associates" of Makenna Productions and pitched the idea of "The Fresh Prince as a Football Star." Id. ¶ 43. In July 2016, Plaintiff produced another film starring Blake called "Blake's World: Tunnel Vision." Id. ¶¶ 45-46. Some of Plaintiff's works have been registered with the Copyright Office under registration numbers PA0002155296 and TX0008679244 (the Works). See id. ¶¶ 91, 94, 97, 120.

In Early October 2017, Plaintiff became aware that Defendants were coming out with a TV show called "All American" (the Series). Id. ¶ 90. Plaintiff alleges that the Series infringes some or all of his Works. See id. ¶¶ 93-94, 99-106, 109, 111-116. Based on that alleged infringement, Plaintiff brings claims for 1) constructive/resulting trust, 2) felony copyright infringement, 3) vicarious, civil and common law copyright infringement, 4) unjust

Inc. v. Richard Feiner & Co., 896 F.2d 1542, 1555 n.19 (9th Cir. 1990); Fed. R. Civ. P. 12(d).

enrichment/conversion, 5) discrimination, 6) unfair competition/business practices, and 7) racketeering.

## II. LEGAL STANDARD

Rule 12(c) of the Federal Rules of Civil Procedure permits a party to move to dismiss a suit "[a]fter the pleadings are closed—but early enough not to delay trial." Fed. R. Civ. P. 12(c). "Judgment on the pleadings is proper when, taking all allegations in the pleading as true, the moving party is entitled to judgment as a matter of law." Stanley v. Trustees of Cal. State Univ., 433 F.3d 1129, 1133 (9th Cir. 2006). It must appear beyond doubt that the plaintiff can prove no set of facts that would entitle it to relief. Enron Oil Trading & Transp. Co. v. Walbrook Ins. Co., 132 F.3d 526, 529 (9th Cir. 1997). Because a motion for judgment on the pleadings is "functionally identical" to a motion to dismiss, the standard for a Rule 12(c) judgment on the pleadings is essentially the same as for a Rule 12(b)(6) motion. Dworkin v. Hustler Magazine, Inc., 867 F.2d 1188, 1192 (9th Cir. 1989). Thus, dismissal is appropriate only if the plaintiff fails to assert a cognizable legal theory or to allege sufficient facts under a cognizable legal theory. See Balistreri v. Pacifica Police Dep't, 901 F.2d 696, 699 (9th Cir. 1990).

The plaintiff bears the burden of pleading sufficient facts to state a claim. Courts will not supply essential elements of a claim that are not initially pled. See Richards v. Harper, 864 F.2d 85, 88 (9th Cir. 1988). Generally, a district court may not consider any material beyond the pleadings in ruling on the motion. Hal Roach Studios, 896 F.2d at 1555 n.19. However, material which is properly submitted as part of the complaint may be considered. Id. Allegations by the non-moving party must be accepted as true, and allegations of the moving party that have been denied must be deemed false for the purpose of the motion. Id. at 1550. However, the court is not required to accept the veracity of "legal

conclusions cast in the form of factual allegations if those conclusions cannot reasonably be drawn from the facts alleged," or "merely conclusory, unwarranted deductions of fact, or unreasonable inferences." Cholla Ready Mix, Inc. v. Civish, 382 F.3d 969, 973 (9th Cir. 2004) (internal quotation marks and citations omitted) (reviewing ruling under Rule 12(b)(6)).

## III. DISCUSSION

### A. Copyright Preemption

Defendants contend that each of Plaintiff's causes of action is "dependent on a finding of copyright infringement." Mot. at 9. However, Defendants explicitly argue only that the Third, Fourth, and Sixth Causes of Action are preempted by the Copyright Act. Id. at 28-30.

The Copyright Act preempts all claims based on any "legal or equitable rights that are equivalent to any of the exclusive rights within the general scope of copyright . . . and come within the subject matter of copyright." 17 U.S.C § 301(a). In other words, claims are preempted where "(1) the work at issue falls within the scope of copyright subject matter, and (2) the law at issue grants rights equivalent to any of the exclusive rights within the scope of copyright." Ryan v. Editions Ltd. W., Inc., 786 F.3d 754, 760 (9th Cir. 2015).

There is no dispute that the Works fall within the scope of copyright subject matter and were in fact registered (or attempted to be registered) with the Copyright Office. Therefore, the only question is whether Plaintiff's claims pleaded "rights equivalent to any of the exclusive rights within the scope of copyright."

### 1. Vicarious, Civil, and Common Law Copyright Infringement (Third Cause of Action)

Plaintiff's Third Cause of Action alleges that "all defendants contributed to the modification and commercial feasibility of *Tunnel Vision*" and "either knowingly or unwittingly infringed plaintiff's exclusive rights in artistic taste, creative control, budgetary controls, style of presentation, and script dynamics to create All American." FAC ¶ 138.

As Defendants note, the Copyright Act explicitly extinguished, on or after January 1, 1978, any rights "under the common law or statutes of any State." 17 U.S.C § 301(a). Plaintiff does not dispute this. Plaintiff's legal arguments about access, Opp'n at 41-42, have no bearing on whether this claim is preempted and is further not relevant for purposes of this motion because Defendants have conceded access. Therefore, Plaintiff's Third Cause of Action, to the extent it purports to be based on anything other than the Copyright Act is preempted by the Copyright Act. However, the Court acknowledges that a claim for vicarious infringement based on a federal direct infringement claim is not preempted. See Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd., 545 U.S. 913, 930 (2005) (A person "infringes vicariously by profiting from direct infringement while declining to exercise a right to stop or limit it").

### 2. Unjust Enrichment/Conversion (Fourth Cause of Action)

Plaintiff alleges that Defendants "participated in acts of conversion . . . regarding the ownership of plaintiff's work" and failed to "get authorization from plaintiff to use *Tunnel Vision* registered under Copyright Registration No. PA0002155296 and Copyright Registration No. TX0008679244." FAC ¶¶ 151, 153. Plaintiff concedes that the Fourth Cause of Action is based on

allegations that Defendants intended to "exclude plaintiff as the right owner of the expression in question." Opp'n at 42. Such a claim depends on Defendants' alleged use of Plaintiff's work without permission, is therefore equivalent to a right under Section 106, and is preempted.[3] See Edwards v. Cinelou Films, LLC, No. 2:16-CV-01014-ODW (AGRx), 2016 WL 9686986, at *5 (C.D. Cal. June 22, 2016), aff'd sub nom. Edwards v. Cinelou Films, 696 F. App'x 270 (9th Cir. 2017) (claim that defendants stole "general storyline from [plaintiff's] works and turn[ed] it into a movie . . . is simply a copyright infringement claim couched as a state law claim for conversion, and is therefore preempted.").

Plaintiff relies on Smith v. Weeknd, No. CV 19-2507 PA (MRWx), 2019 WL 6998666 (C.D. Cal. Aug. 23, 2019) to establish that his claims are not preempted. Opp'n at 39. In Smith, the plaintiffs alleged that defendants created, published, and distributed a song that allegedly infringed a copyright for plaintiffs' song. Id. at *1. The plaintiffs did not dispute that their claims for constructive trust and unjust enrichment were preempted. Id. at *6. Instead, the plaintiffs argued that they asserted these claims in the alternative, to the extent the defendants successfully defended the copyright infringement claims by establishing that defendants obtained a license to use plaintiffs' song without plaintiffs' knowledge. Id. The district

[3] In opposition, Plaintiff asks to add a cause of action for "False Designation of Origin" and "violation of the Lanham Act." Mot. at 42, 45. This is not the proper mechanism for Plaintiff to seek to amend his complaint to add new claims. Moreover, Plaintiff has not stated any facts that would support a claim for False Designation of Origin or violation of the Lanham Act that would not be preempted by the Copyright Act. See Dastar Corp. v. Twentieth Century Fox Film Corp., 539 U.S. 23, 37 (2003) ("[T]he phrase 'origin of goods' in the Lanham Act . . . refers to the producer of the tangible goods that are offered for sale, and not to the author of any idea, concept, or communication embodied in those goods").

court found that such allegations were not included in the complaint and dismissed the constructive trust and unjust enrichment claims with leave to amend. Id. However, after reviewing plaintiffs' amended complaint, the district court denied defendants' motion to dismiss holding that plaintiffs now "plausibly allege[d] the . . . state law claims as alternatives to the unchallenged claim for direct copyright infringement." Smith v. Weeknd, No. CV 19-2507 PA (MRWx), 2019 WL 6998777, at *2 (C.D. Cal. Nov. 6, 2019). This case is inapplicable because the FAC here contains no allegations that Defendants may have had a license, secret or not, to use the Works. Nor could he. In Smith, publishers had acquired the rights to promote the song, and therefore there was a possibility that the publishers entered into agreements of which the plaintiffs were not aware. Here, no one but Plaintiff had the rights to exploit his Works, and therefore there could be no allegations of a secret agreement.

**3. Unfair Competition, Business Practices (Sixth Cause of Action)**

Plaintiff alleges that Defendants violated California's unfair competition law when they "violated the resulting and constructive trust" because "they had [for] four and a half years an 'opportunity to view or copy plaintiff's work.'" FAC ¶ 167 (emphasis deleted) (footnote omitted). Plaintiff also alleges that "false or misleading credits are actionable" and Defendants "'palmed off[]' plaintiff's moral ties to *Blake* when they hired a Black British actor to portray their infringing character named *Spencer*." Id. ¶ 168. To the extent these allegations can be interpreted to state an unfair or unlawful business act, presumably that Defendants' copied Plaintiff's work without giving him any credit, this claim is substantially equivalent to the rights protected under the Copyright Act and is preempted. See Sybersound Records, Inc. v. UAV Corp., 517 F.3d 1137, 1152 (9th

Cir. 2008) ("To the extent the improper business act complained of is based on copyright infringement, the claim was properly dismissed because it is preempted.").

Plaintiff argues that his claim is not preempted because "the 'exceptions' are plead[ed] in this case." Opp'n at 43. However, he does not explain what "exceptions" he is referring to or even what "exceptions" there are. Plaintiff also notes that he reported Defendants to certain government agencies and that an unfair competition claim "can be used under Section 337 of the Tariff Act of 1930." Id. But Plaintiff does not allege such a claim, nor assert that he could. See Potter v. Toei Animation Inc., 839 F. Supp. 2d 49, 53 (D.D.C. 2012), aff'd, No. 12-5084, 2012 WL 3055990 (D.C. Cir. July 18, 2012) ("the Tariff Act of 1930 . . . does not provide for a private right of action.").

The Court will view the Third, Fourth, and Sixth Causes of Action as a claim for federal copyright infringement.

**B. Copyright Infringement**

"A plaintiff bringing a claim for copyright infringement must demonstrate '(1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original.'" Funky Films, Inc. v. Time Warner Entm't, 462 F.3d 1072, 1076 (9th Cir. 2006) (quoting Feist Publications, Inc. v. Rural Tel. Serv. Co., 499 U.S. 340, 361 (1991)). "[T]he second element has two distinct components: 'copying' and 'unlawful appropriation.'" Rentmeester v. Nike, Inc., 883 F.3d 1111, 1117 (9th Cir. 2018), cert. denied, 139 S. Ct. 1375 (2019). "By establishing reasonable access and substantial similarity, a copyright plaintiff creates a presumption of copying. The burden shifts to the defendant to rebut that presumption through proof of independent creation." Three Boys Music Corp. v. Bolton, 212 F.3d 477, 486 (9th Cir. 2000).

For purposes of this motion, Defendants assume Plaintiff has established copyright ownership and access, but argue that the works are not substantially similar as a matter of law. Mot. at 10. Substantial similarity is established through the two-part extrinsic/intrinsic test. Three Boys Music, 212 F.3d at 485. "At the initial 'extrinsic' stage, [courts] examine the similarities between the copyrighted and challenged works and then determine whether the similar elements are protectable or unprotectable." Mattel, Inc. v. MGA Entm't, Inc., 616 F.3d 904, 913 (9th Cir. 2010), as amended on denial of reh'g (Oct. 21, 2010). "The extrinsic test focuses on 'articulable similarities between the plot, themes, dialogue, mood, setting, pace, characters, and sequence of events' in the two works." Funky Films, 462 F.3d at 1077 (quoting Kouf v. Walt Disney Pictures & Television, 16 F.3d 1042, 1045 (9th Cir. 1994)). "The intrinsic test is subjective and asks 'whether the ordinary, reasonable person would find the total concept and feel of the works to be substantially similar.'" Three Boys Music, 212 F.3d at 485 (quoting Pasillas v. McDonald's Corp., 927 F.2d 440, 442 (9th Cir. 1991)).

Defendants argue that the Court can determine substantial similarity as a matter of law. Mot. at 10 (quoting Zella v. E.W. Scripps Co., 529 F. Supp. 2d 1124, 1130 (C.D. Cal. 2007)); see also Christianson v. W. Pub. Co., 149 F.2d 202, 203 (9th Cir. 1945) ("There is ample authority for holding that when the copyrighted work and the alleged infringement are both before the court, capable of examination and comparison, non-infringement can be determined on a motion to dismiss."); Cano v. A World of Difference Inst., No. C 95-03291 CW, 1996 WL 371064, at *6 (N.D. Cal. May 31, 1996) ("[J]udgment on the pleadings may be granted where the facts asserted by the non-moving party in its pleadings and all reasonable inferences from those facts show the absence of substantial similarity."). Plaintiff contends that "[d]ismissal of a complaint for lack of substantial similarity before any discovery is

virtually unheard of," and that there are "only [two] [Ninth Circuit] cases affirming dismissal for lack of substantial similarity." Opp'n at 10. However, Plaintiff does not, and cannot, assert that the Court is without power or authority to determine substantial similarity as a matter of law. See Benay v. Warner Bros. Entm't, 607 F.3d 620, 624 (9th Cir. 2010) ("Substantial similarity is a fact-specific inquiry, but it 'may often be decided as a matter of law.'" (quoting Funky Films, 462 F.3d at 1076)). However, "[o]nly the extrinsic test's application may be decided by the court as a matter of law." Rentmeester, 883 F.3d at 1118.

**1. The Works at Issue**

Plaintiff has two registered copyrights. Dkt. 57 (Biscay Decl.), Exs. 3, 4.[4] Copyright Registration No. PA 2-155-296 covers a "Blake's World" video, an approximately 16-minute short film (Short Film). Id., Ex. 3. Copyright Registration No. TX 8-679-244 is for a Treatment and a Business Plan related to "Blake's World." Id., Ex. 4. Plaintiff has submitted an application for registration of other works, but no other works have been registered by the Copyright Office. See Dkt. 90 (1/11/2020 Ricketts Decl.) ¶¶ 3-4.

Section 411(a) of the Copyright Act "bars a copyright owner from suing for infringement until 'registration . . . has been made.'" Fourth Estate Pub. Benefit Corp. v. Wall-Street.com,

[4] The Court GRANTS Defendants' unopposed request for judicial notice (Dkt. 58) of Plaintiff's copyright registrations and the "promos" for, and first two episodes of, All American. Fed. R. Evid. 201(b). Plaintiff also filed a request for judicial notice of a DVD containing five TV show episodes of unrelated shows and three "adjudicative facts," which were simply Plaintiff's interpretations of three cases. Dkt. 84. Defendants oppose Plaintiff's request arguing that Exhibit 6 (the DVD) has not been authenticated and is irrelevant and Exhibits 7-9 (the case interpretations) are not proper subjects for judicial notice. Objs. at 4-6. The Court agrees. Plaintiff's request for judicial notice is DENIED.

LLC, 139 S. Ct. 881, 888 (2019) (alteration in original) (quoting 17 U.S.C. § 411(a)). The Supreme Court has recently held that "'registration . . . has been made' within the meaning of 17 U.S.C. § 411(a) not when an application for registration is filed, but when the Register has registered a copyright after examining a properly filed application." Id. at 892. Therefore, at this time, the Court considers only the works that are subject to a registered copyright: the Short Film, the Treatment, and the Business Plan.[5]

**2. Substantial Similarity**

a. Plot

Both Plaintiff's Works and the Series involve a talented African-American football player from the "hood" who eventually plays football for a school in a "more privileged" area (Blake in the Works and Spencer in the Series). However, "a well-trodden 'rags to riches' story arc . . . is not protectable." Esplanade Prods., Inc. v. Walt Disney Co., No. CV 17-02185 MWF (JCx), 2017 WL 5635027, at *9 (C.D. Cal. Nov. 8, 2017), aff'd, 768 F. App'x 732 (9th Cir. 2019). Further, both the Treatment and the Series begin with a shooting in the "hood," and in both the Treatment and the Series, the protagonist faces racism from the white football player who plays the same position and attempts by players on the team to make the protagonist look bad. Both also contain scenes where the protagonist goes back and forth between the "hood" and the "privileged" area. However, these plot points "flow necessarily or naturally from a basic plot premise" and are therefore not protectable. Benay v. Warner Bros. Entm't, 607 F.3d 620, 625 (9th Cir. 2010).

---

[5] Even if the Court considered the 2-page Cold Opening and the 93-page movie script attached to the Complaint, the Court would not necessarily reach a different result.

The plot similarities end there. The protagonists play different positions, Blake is the quarterback while Spencer learns to play both offense and defense, but is never the quarterback. In Plaintiff's Works, the protagonist is wrongly accused of rape and is beaten by the police. These elements were included to "expand on the major plot of 'racial injustice,' a means to highlight 'police brutality.'" Opp'n at 14. There is no corresponding interaction with the law or law enforcement in the Series, or a major plot point of racial injustice or police brutality. On the other hand, the central plot point of the Series is the relationship between the protagonist and the football coach, who is secretly the protagonist's father.[6] Although the Treatment mentions that Blake "makes inroads with the coach," the coach does not appear to be a central character. Further, a storyline of a coach acting as a mentor to a player is not protectable. See Campbell v. Walt Disney Co., 718 F. Supp. 2d 1108, 1112 (N.D. Cal. 2010) (the Court finds this young mentee-older mentor storyline to be a 'basic plot idea . . . not protected by copyright law.'" (alteration in original) (quoting Cavalier v. Random House, Inc., 297 F.3d 815, 824 (9th Cir. 2002)).

In addition, while the protagonist travels between "home" and "school" in both the Treatment and the Series, Blake's classmate from home tries to talk Blake into staying and selling drugs (and eventually succeeds), while Spencer goes home to spend time with his younger brother and tries to talk his best friend out of selling drugs and hanging out with "gang-bangers."

[6] Plaintiff asserts that in the Works a "Professor Henson" at the college that Blake and his sister attend ends up being their estranged father. Opp'n at 11 (citing Exhibit A at 8-9). However, the cited Business Plan does not reference a Professor Henson or state that any professor at the college is Blake's father; the Business Plan merely states that Blake's sister "promised herself she'd move to Los Angeles to find her father." Business Plan at 7.

Further, Blake's "biggest *fear* is returning to the inner-city, and being a failure without an opportunity to become a pro-football player." Opp'n at 11. However, Spencer has no fear of returning home; his fears are disappointing his family, not professional failure. And in the Treatment, Blake is mainly picked on by the white, racist football player who plays the same position; in the Series the most serious conflicts come from the coach's son, who is half black and plays a different position than Spencer's. His actions stem from jealousy that his dad is giving more attention to Spencer, not racism or competition for the same position. Plaintiff further highlights the differences between the Works and the Series because the initial act of gun violence in the Works apparently "transcend[s]" the theme, while Spencer "doesn't care." Opp'n at 24. Plaintiff also highlights that Spencer was "offered a way out" and only had to travel 11 miles, while Blake had to "earn his way out" and traveled 2,500 miles. Id.

The Court concludes that although the plot is similar at a high level, as a matter of law the protectable elements are not substantially similar.[7]

b. Theme

Plaintiff alleges that both the Works and the Series share the theme of "taking an African American football star out of his urban world and putting him into the privileged world." FAC ¶ 111. Both also share the themes of "football, racial tension and frequent visits to the 'urban park.'" Id. Defendants correctly

[7] Plaintiff alternatively claims that "[w]hen a work involves a 'new genre' differences between the two works were nevertheless found substantially similar." Opp'n at 25 (emphasis deleted) (citing Daly v. Palmer, 6 F. Cas. 1132 (C.C.S.D.N.Y. 1868) (No. 3,552). It is not clear to the Court what Plaintiff means by this, nor does it find persuasive this one hundred-and-fifty-year-old case.

contend that these are "underlying plot ideas, not themes." Mot. at 22; see Silas v. Home Box Office, Inc., 201 F. Supp. 3d 1158, 1180 (C.D. Cal. 2016), aff'd, 713 F. App'x 626 (9th Cir. 2018) ("[T]he alleged theme of 'fast paced and lavish lives of professional football players' is an underlying plot idea, not a theme."). A theme is an overarching message, such as "celebrat[ing] family values" or "the triumph of good over evil," Kouf, 16 F.3d at 1045, or "sex and death provide focal points for relationships" or "sex and religion don't mix," Funky Films, 462 F.3d at 1079-80.

The theme of the Series is purportedly "the difficulty of navigating between two different worlds, while trying to maintain an authentic connection to each." Mot. at 22. Plaintiff does not contest this description, but contends that the Works also contain the theme of "bouncing between both worlds." Opp'n at 23. In the Series, Spencer is attempting to figure out how to fit in at home, even though he no longer goes to school there or lives there, and at the same time trying to fit in at school, with people who have grown up with totally different experiences (e.g. having sushi days at school). However, in the Treatment, the protagonist is not trying to maintain a connection to both worlds at the same time; he must choose what life to live. He portrays his trips back home as a "seduction back into the hood orbit" after he "loses his super focus," and his returns to school are getting "his life somewhat back on track" and not "refus[ing] the call of destiny of his own life." Treatment at 3. He has the choice of staying home and "join[ing] a gang" or "leav[ing] the streets alone and go[ing] back to college." Id. at 9. Although both the Works and the Series contain two different worlds, the themes stemming from the protagonists' relationships to those worlds are very different.

Further, the Business Plan's theme of the "fish-out-of water," Business Plan at 5, is not protectable and arises naturally from the premise of a poor, young, black man attending a school

with rich, mostly white students. See Benay, 607 F.3d at 627 (General theme of fish-out-of-water "arise[s] naturally from the premise of an American war veteran who travels to Japan to fight the samurai."). Similarly, the alleged theme of the struggles of an inner-city African American football star, Opp'n at 23-24, or "finding love, support, and learning life lessons," id. at 17, is also too generic to be protectable. See Esplanade, 2017 WL 5635027, at *11 ("whether 'one can become anything he or she wants to be,' whether 'one can overcome . . . the prejudices inherent in a diverse society . . . [and] within oneself,' or whether 'characters can achieve success while upholding moral and ethical behavior' are too generic to be protectable") (alterations in original); Schkeiban v. Cameron, No. CV 12-0636-R MANX, 2012 WL 5636281, at *2 (C.D. Cal. Oct. 4, 2012), aff'd, 566 F. App'x 616 (9th Cir. 2014) ("[T]he general similarities between these themes, such as saving the world or battles between good and evil are not subject to copyright"); Campbell, 718 F. Supp. 2d at 1113 ("[A]lthough the works share themes of self-reliance and the importance of friendship and teamwork, these themes often predominate stories of competition, especially those where the protagonist begins the story as cocky and self-centered, and are thus generic and not protectable."); Tiscareno v. Netflix, Inc., No. CV 13-01560 SJO (AGR), 2014 WL 12558125, at *10 (C.D. Cal. Mar. 6, 2014) ("central themes of courage and overcoming obstacles . . . are not protectable").

The themes of racism and poverty, Opp'n at 23-24, are also too general to be protectable and are portrayed somewhat differently. See Marcus, 279 F. Supp. 3d at 1068 ("While both families may be dealing with the struggles of being a minority in a majority culture, the message in each work is distinct."); Griffin v. Peele, No. EDCV 17-01153 JGB (KKx), 2018 WL 5117555, at *8 (C.D. Cal. Jan. 18, 2018) ("Both works explore themes of relationships and race, but do so in distinct ways. The Book is a

first-person account of an interracial relationship and focuses on both dating and staying true to one's religious beliefs. By contrast, the primary theme of the movie, racism, is explored through the lens of a horror movie."). In the Series, Spencer faces obvious examples of his relative poverty compared to his classmates (he does not have a laptop for science class; he does not have a suit for the important sports booster gala). In the Works, Blake does not confront his relatively impoverished background at school. Further, in the Treatment, the racism is more overt and political, with references to white supremacism, the "n" word, black face, police brutality, Donald Trump, and "Make America Great Again." In the Series, the racism is subtler; for example, one of the football players asks Spencer if he is a "Blood or a Crip." The Court concludes that the general themes are explored in different ways and therefore are not substantially similar.

c. Characters

Plaintiff alleges that many of the characters in the Works and the Series are substantially similar. See FAC ¶¶ 99-106.

**Blake v. Spencer.** The protagonists of the two works are similar at the abstract level – they are both young, African-American men who are from disadvantaged neighborhoods and play football. Yet the two characters have very different motivations. Funky Films, 462 F.3d at 1078-79 (Although "[t]he 'prodigal son' characters of the two works" are "similar at the abstract level" in that they are both older sons who work outside the funeral industry, but return home after their father dies, they "are markedly different in the two scripts" in that one returns reluctantly and shows little interest while the other quickly restores the business); see also Marcus, 279 F. Supp. 3d at 1069 ("Besides working hard to provide a good life for their families, the two men do not share many attributes"); Silas, 201 F. Supp. 3d at 1178 (no substantial similarity between characters that were

professional football players who suffered injuries, who were also businessmen); Tiscareno, 2014 WL 12558125, at *9 (no substantial similarity when there is "a significant age gap, there are different maturity levels, . . . different outlooks on life" and "different perspectives and moods.").

For Blake, it is the coach's statement that he could become the starting quarterback and take the team to the NCAA championship that "sparks a dormant flame within [him]," Treatment at 1, while for Spencer, it is his mom and her financial struggles that convince him to play football in Beverly Hills. Similarly, while Spencer considers a failure on the field to be failing his family, Blake ties success in football to success in his own life. Further, Spencer's biggest internal struggle is dealing with the fact that his father left him when he was young. Blake's primary struggle appears to be experiencing racism in the "privileged world." Although both characters have absent fathers, Blake's father was killed by a gang in the Treatment and Spencer's father simply left. Blake was raised by his aunt, because his mother was in jail; Spencer was raised by his mom. Both have brothers, but Blake's brother is a drug dealer who is in a coma for a portion of the Treatment, while Spencer's brother is a smart little kid whom Spencer visits regularly and helps with his homework. Plaintiff also concedes a number of differences. For example, Plaintiff contends that "Spencer is violent, and 'offered a way out', unlike Blake who discourages violence and sought to 'earn his way out.'" Opp'n at 19. Further, Plaintiff notes that the initial act of gun violence has little effect on Spencer, id. at 20 ("Spencer spends *approximately two seconds* in disbelief"), while the shooting that killed Blake's cousin and injured his brother is a major element of his character, id. at 13 ("He arrives at college bearing the weight of his prior life experiences, including but not limited to the recent shooting that left his brother in a coma and his cousin dead."). In addition, Blake has a "small-town-southern-

accent, diction and demeanor," id. at 37, while Spencer is from Crenshaw in Los Angeles.

The fact that both characters wear the number 11 is not sufficient to establish substantial similarity. Marcus v. ABC Signature Studios, Inc., 279 F. Supp. 3d 1056, 1069 (C.D. Cal. 2017) ("The fact that the families in both works have the last name Johnson and both have son characters who are 'juniors' is of no consequence, particularly where, as here, the names are generic"). Similarly, that both players have a similar build, size and shape, Opp'n at 30, naturally stems from the basic plot point of a young star football player.

**Alex v. Jordan Baker.** Both characters are privileged, biracial[8] men who play football with the protagonist. Alex is a "'straight laced' fiscal conservative," who is "intelligent and majors in Criminal Justice and . . . wants his friend to be a successful Blake [sic] man." Treatment at 2, 9. He vehemently defends Blake when he is accused of rape and helps expose the set up. Id. at 9. Because Alex is Blake's friend, he also becomes a victim of the hazing by the seniors. Id. at 5. On the other hand, Jordan is not straight laced or a fiscal conservative, and does not want Spencer to succeed. Jordan is the one who set up Spencer in the Series by having him drink too much before an important practice and by reporting his illegal transfer to Beverly Hills. That the African American protagonist has a biracial teammate does not overcome the differences between the characters. See Griffin, 2018 WL 5117555, at *8 (even though "the main couple is also in an interracial relationship . . . the Court finds Plaintiff has failed to allege facts that would show a high degree of similarity between the characters").

[8] As Defendants point out, nothing in the Treatment indicates Alex is biracial; it only calls him a "black guy." Treatment at 2.

**Kenny Jenkins v. Tamia "Coop."** Both characters are from the protagonist's home town and are close to the protagonist. Kenny is Blake's brother, a drug dealer who gets shot. He uses his money from drug dealing to help the aunt that raised Blake and Kenny. Coop is Spencer's best friend from home, who feels pressured to join a gang after Spencer leaves. While Kenny has always been in a gang, Coop relied on Spencer to stay on the straight and narrow and feels compelled to join a gang once she no longer has Spencer to protect her. These characters are not substantially similar. See Silas, 201 F. Supp. 3d at 1179 (no substantial similarly where one character "help[s] [the protagonist] bribe a cop" while the other "tries to get [the protagonist] to live on the straight and narrow").

**Sabrina v. Leila Keating.** Both characters are the protagonists' love interests, but they are otherwise very different. See Funky Films, 462 F.3d at 1079 (both characters are "romantically involved with the older brother in each story[,] [h]owever the two have little in common"). In the Treatment, Sabrina has "family and friends who grew up in the ghetto," but "her mom decided that it was in her best interest not to stand in the Section 8 line" and "moved to the suburbs when Sabrina was 8 and now she owns 2 grocery store franchises." Id. at 2-3. She and Blake begin dating and she loses her virginity to him. In contrast, Leila is extremely rich and has an absent father. Her mother died in a car crash. She is dating the football player who plays the same position as Spencer, and although Spencer and Leila flirt in the first two episodes, nothing romantic occurs. See Silas, 201 F. Supp. 3d at 1179 (no substantial similarity where when the story began one romantic interest was already divorced from the protagonist, while the other was dating the protagonist).

**Petty Da Prince v. Shawn Scott.** Petty is Blake's former "classmate and wanna be rapper . . . who tries talking Blake into

selling drugs." Id. at 3. They share a "delightful moment" together at the neighborhood park at home. Id. Blake hangs out with Petty every time he comes home. On the other hand, Shawn is Spencer's antagonist at home – they get into a fight in each of the first two episodes, both times because Spencer is trying to protect his friends and family from the "gang-banger" life.

**Derek v. Asher Adams.** Both are the white football players that play the same position as the protagonist. A rival in the new school naturally flows from the basic plot idea and therefore is not protectible. See Cavalier, 297 F.3d at 824. Further, the characters are different. Derek is overtly racist ("a cocky, MAGA hat wearing subtle white-supremacist") and his interactions with the protagonist focus on the football rivalry. On the other hand, Asher is less overtly racist (he tries to calm his racist dad down at a sports booster event) and his jealously stems from the fact that his girlfriend is flirting with Spencer more than the football rivalry. Each time Asher says, "we have to get rid of him," Spencer is talking with Asher's girlfriend. Also, Asher has story lines unrelated to Spencer, including that he had a relationship with the coach's daughter, who happens to be one of Spencer's closest friends at his new school. These characters are not substantially similar. Silas, 201 F. Supp. 3d at 1178 (characters that are both "well-dressed football players who are sexually promiscuous, drive fancy cars, and have a cocky attitude . . . is not a protectible expression").

**Other characters.** There are no distinct characteristics of the "coach" figure in the Treatment and the coach in the Business Plan is described as "anything but qualified" with a "neurotic personality." Business Plan at 10. Coach Billy Baker is a main character in the Series and a former professional football player. He is portrayed as a more than competent coach, who has suffered some losing seasons. Similarly, the coach's wife plays a big role in

the Series, while there is no counterpart in the Works. See Funky Films, 462 F.3d at 1079 (noting characters that have no counterpart in the plaintiff's work).

d. Setting

Plaintiff alleges that both the Works and the Series are "set in Los Angeles" and "led by an African American Football star with the distinctive trait of bouncing between both the urban world and the privileged world." FAC ¶ 112. "The mere fact that the two shows are set in the same city does not give rise to a finding of substantial similarity of copyrightable expression." Silas, 201 F. Supp. 3d at 1176. Further, scenes taking place at school and on the football field naturally flow from the basic plot points. Id.; see also Shame on You Prods., Inc. v. Elizabeth Banks, 120 F. Supp. 3d 1123, 1159 (C.D. Cal. 2015) ("The use of a gentleman's bedroom is a scene-a-faire, since going home with someone met at a bar, party or club is an essential element of a walk of shame"), aff'd sub nom. Shame on You Prods., Inc. v. Banks, 690 F. App'x 519 (9th Cir. 2017). The same can be said about characters in both works talking to their friends while sitting on swings.

There are also a number of important differences in the setting. The Baker home plays an important role in the Series, particularly related to Spencer's integration into the Baker's residence, while Blake appears to live in the dorms or in an apartment at college that does not factor into the plot. On the other hand, Elysian Park plays a crucial role in the Treatment and the Short Film, while there is no similar place in the Series.

As Plaintiff points out, there is a significant difference between Blake's hometown in Florida, which is more than 2,500 miles away, and Spencer's hometown, which only requires an eleven mile bus ride. Opp'n at 37. The distance between the

"home" and "privileged world" is relevant because Blake has additional pressure to succeed in the privileged world while Spencer can "run down the road, cry to his mother, and escape from his problems in either world." Id.

e. Mood

Plaintiff further alleges that both have a "general mood of fearlessness and greatness" and an "element of solitude and telling two very different stories, in different communities." Id. ¶ 113(i). However, the mood of "fearlessness and greatness" flows from the basic plot point of a star athlete. See Shame on You, 120 F. Supp. 3d at 1158 ("A general mood that flows 'naturally from unprotectable basic plot premises' is not entitled to protection." (quoting Rice v. Fox Broad. Co., 330 F.3d 1170, 1177 (9th Cir. 2003)). Further, the Business Plan describes "Blake's World" as a "socially conscious comedy." Business Plan at 1; see also id. at 5 ("Here we have a 'fish-out-of-water' comedy"); id. at 6 (Blake's World "incorporat[es] present day political issues in satire portrayal"). The Series is not at all comedic or satirical. Moreover, the Works all have political undertones while the Series focuses on high school drama.

f. Pace

"The timeline of a work is an important factor in determining whether pace is substantially similar." Silas, 201 F. Supp. 3d at 1181 (C.D. Cal. 2016) (citing Kouf, 16 F.3d at 1046). The Treatment takes place over one football season, while each episode of the Series appears to take place a few days at a time. The Short Film appears to take place in less than a week. Even considering that the Treatment and (presumably) the Series take place over the course of a football season, this flows naturally from the plot and is unprotectable. See id. at 1181-82 (both works took place over the football off-season stems from basic plot premise of

football players during the football off season). Moreover, the Works "provide a time-lapse so . . . [they] wouldn't have to go into a Thanksgiving or Christmas plot point(s)." Opp'n at 15. There is nothing in the Series indicating that there are time lapses to skip over certain times of the year.

Plaintiff also alleges that both "are at times a fast pace, then dramatic." Id. ¶ 113(ii). However, this describes any show or movie involving sports and youth drama. See Olson, 855 F.2d at 1451 (although "[b]oth works are quickly paced . . . these similarities are common to the genre of action-adventure television series and movies and therefore do not demonstrate substantial similarity."); Shame on You, 120 F. Supp. 3d at 1162 ("even if it is assumed that both works feature the brisk pace of many modern comedies, similarities of pace that are common to a genre are insufficient to satisfy the extrinsic test").

g. Dialogue

Plaintiff alleges that in both works, the protagonists' dialogue is "harsh, honest, sarcastic, sweet, inspirational, misunderstood and/or full of questions," the best friend provides "clarification on future decisions," the antagonist "creates racial tension," and the football coach provides "clarification as to the protagonists' deepest desire(s). **TO WIN!**" FAC ¶ 114. However, the FAC does not quote any specific dialogue from any of the Works, let alone the registered Works, that it contends is substantially similar to the dialogue in the Series.

In opposition, Plaintiff cites to dialogue that he asserts is similar between the Works and the Series. However, it all stems from his unregistered script. Moreover, even if the Court considered the script, Plaintiff has not "demonstrated the type of extended similarity of dialogue needed to support a claim of substantial similarity." Olson, 855 F.2d at 1450.

First, Plaintiff describes dialogue from his unregistered script where the protagonist calls out "fifty-seven's the mike" in a football game. See Opp'n at 35. Plaintiff notes that Spencer also says "57's the Mike" in the first scene of the pilot. Although saying that a certain number is "the Mike" is not protectable, Plaintiff argues that the choice of the number 57, out of all possible numbers, indicates copying. Id. at 36. However, using the same number in a common football phrase is not "extended similarity."

Second, in the Series, Coop tells Spencer to "take the best of both worlds" and "take care of himself" – not anyone else. Mot. at 36. In the unregistered script, one character tells Blake he should not have gone to the Los Angeles college where he is "tolerated" but instead should go to "somewhere he's celebrated," and another character says there is "more opportunity in California." Id. Similarly, another character tells Blake to "stop jumping back and forth between two separate lives. You can't be Blake the football star and Blake from back home." However, this does not even convey the same idea, let alone use substantially similar words: Coop says to take the best of both worlds; the characters in the unregistered script are disagreeing over which world Blake should be in and are encouraging him to choose one.

Third, Plaintiff states that when Leila first met Spencer she said "Hey aren't you some crazy good football player," and in the unregistered script when Sabrina first met Blake she said "Everybody was looking at you at the party. You're the star football player. You're the money tree to a lot of people around here." Opp'n at 19. Commenting that the protagonist is a star football player is not "extended similarity" and flows from the basic plot. Further, the context of the statements is not similar. Leila was telling Spencer that the other players were scared because Spencer was a good football player. Sabrina was

commenting that people were excited for Blake because he was a "money tree." These do not convey the same ideas.

h. Sequence of Events

Plaintiff alleges that both the Works and the Series follow a "straight, linear trajectory" that stems from "protagonists [who] want[] to become a pro football player, deals with racism and two completely different set of common problems plagued in both worlds." FAC ¶ 115(ii). In both, the protagonists "win their championship games and are able to bring their family and friends closer as a way to blend both realms." Id. at ¶ 115(iii). To the extent these plot points are actually present in both the Works and the Series, they naturally stem from the basic plot and are therefore not protectible.

Further, the specific sequence of events in the Works and the Series is quite different. The Treatment and the Short Film begin with Blake already at school in the privileged area, while the Series begins in Spencer's hometown. The Short Film does not have any scenes where Blake is playing football, while Spencer is playing football in almost every other scene. In the Treatment, Blake immediately becomes friends with some of his lowerclassmen teammates. Spencer does not make friends with the other players on the team. Although Jordan tries to show Spencer around and even picks him up from his house, it is because the coach asked him to do it, not because they are friends. In the Treatment, Blake goes home and misses the first three games of the season after getting news that his brother woke up from his coma. Spencer goes home at night, but he does not miss any football practice or games.

The Treatment also focuses on the racism Sabrina faces, the shooting of an unarmed black man by a cop, and then Sabrina and Blake having sex. There are no similar scenes in the Series. The

Treatment (and the Short Film) have other scenes that are completely absent from the Series, including where Blake has sex with a white classmate who accuses him of rape, scenes where he is in jail, scenes in court fighting the rape case, and scenes discussing police shootings of black men. The Series also has scenes that are absent from the Works, particularly the scenes at the coach's house showing that family's dynamics.

In addition, to the extent there are facially similar scenes, they are portrayed differently. Both the Treatment and the Series have scenes in class. However, in the Treatment "Blake says some highly intelligent shit about Black History" in an African American Studies class. Treatment at 2. Spencer is in a science class and is judged for being the only one without a laptop. And while both the Treatment and the Series have scenes related to playing football, in the Treatment, Blake's first success on the field leads to "under the table endorsement deals" and "new attention from the ladies." Id. at 4. His other football successes also lead to personal gain. See id. at 6 ("Blake even gets an endorsement from Marshawn Lynch's Beast Mode clothing branding."). In the Series, unnamed students now say hello to Spencer in the hallway, but his success on the field leads the coach's son to try and get Spencer kicked off the team for his illegal transfer to Beverly Hills. He does not get any financial gain from his success on the field.

Although both the Treatment and the Series have a scene where the protagonist is harmed by drinking, the scenes play out differently. In the Treatment, Derek spikes all of the lowerclassmen's drinks with LSD; the scene describes Blake's trip which involves racist trees. In the Series, Jordan encourages Spencer to drink, but he does so voluntarily and there is no political or racist undertones. Further, this experience causes Spencer to quit the team. Blake is suspended for missing practice

but is not personally discouraged from playing football. To the contrary, Blake is energized from the situation and "plays like he's at the NC[A]A" at the next practice. Id. at 5.

### 3. Compilation

Plaintiff also argues that "even if a work is solely comprised of unprotected elements, copyright protection may extend to a sufficiently original compilation or integration of those elements." Opp'n at 25; see also Metcalf v. Bochco, 294 F.3d 1069, 1074 (9th Cir. 2002) ("The particular sequence in which an author strings a significant number of unprotectable elements can itself be a protectable element."). However, "[m]any courts have been reluctant to expand this concept beyond the clear-cut case presented in *Metcalf*." Zella, 529 F. Supp. 2d at 1138 (collecting cases). Specifically, it is not sufficient to point out "random similarities." Id. (collecting cases). As explained above, most of the similarities between the two works flow from the basic plot and are therefore not a "sufficiently original" compilation under Metcalf.

In addition, Plaintiff's description of the "sufficiently original compilation or integration of those elements" overstates the similarities. Opp'n at 25-26. For example, Plaintiff asserts that both start with a celebration cut short by an incident of neighborhood gun violence. Id. at 26. However, the Treatment starts with the gun violence (there is no celebration), and, as Plaintiff notes, the act of gun violence played a relatively minor role in the Series, while it played a major role in the Works. Additionally, Plaintiff states that the "title character is then thrust into the privileged world." Id. However, Plaintiff emphasizes that Blake willingly chose, and wanted, to attend college in Los Angeles, while Spencer is hesitant to go and does it for his mom. Plaintiff also states that both face "the same antagonist in the inner-city (gang-banging drug dealer who[] [has]

known the title character his whole life and wants to be a 'rapper'"). Id. But Blake has no antagonist in the inner-city—Petty Da Prince is his friend—and there is nothing in the Series indicating that Shawn wants to be a rapper.

Despite isolated similarities, the Works and the Series tell decidedly different stories, and lack substantial similarity as a matter of law. Defendants' motion is GRANTED as to the Third, Fourth, and Sixth Causes of Action for copyright infringement. See Shame on You, 120 F. Supp. 3d at 1171-73 (granting judgment on the pleadings with prejudice as to copyright infringement claims where "there is no substantial similarity between plaintiff's and defendants' works as a matter of law.")

**C. Remaining Claims**

As to the remaining claims, the Court construes Defendants' motion for judgment on the pleadings as a motion to dismiss. See Baiul v. NBC Sports, a division of NBCUniversal Media, LLC, 732 F. App'x 529, 531 (9th Cir. 2018), as amended (June 13, 2018) (district court has authority to construe motion for judgment on the pleadings as a motion to dismiss); Citizens Dev. Corp., Inc. v. Cty. of San Diego, No. 12-CV-0334 GPC KSC, 2017 WL 1089549, at *3 (S.D. Cal. Mar. 23, 2017) ("The mere fact that a motion is couched in terms of Rule 12(c) does not prevent the district court from disposing of the motion by dismissal rather than judgment."). "Courts have discretion to grant Rule 12(c) motions with leave to amend." Citizens Dev. Corp., 2017 WL 1089549, at *3.

**1. Resulting/Constructive Trust (First Cause of Action)**

A resulting trust is implied by law where there is a "transfer of property under circumstances showing that the transferee was not intended to take the beneficial interest." Martin v. Kehl, 145 Cal. App. 3d 228, 238 (1983) (quoting Am. Motorists Ins. Co. v.

Cowan, 127 Cal. App. 3d 875, 884 (1982)). "A plaintiff seeking imposition of a constructive trust must show: (1) the existence of a *res* (property or some interest in property); (2) the right to that *res;* and (3) the wrongful acquisition or detention of the *res* by another party who is not entitled to it." Mattel, 616 F.3d at 909. "A resulting trust has frequently been called an intention-enforcing trust, as opposed to the fraud-preventing function of a constructive trust." Seabury v. Costello, 209 Cal. App. 2d 640, 645 (1962). "The resulting trust carries out the inferred intent of the parties; the constructive trust defeats or prevents the wrongful act of one of them." Martin, 145 Cal. App. 3d at 238 (quoting Am. Motorists Ins. Co., 127 Cal. App. 3d at 885).

Plaintiff alleges that Defendants "accepted the protected expression under all kinds of circumstances." FAC ¶ 127. To the extent Plaintiff is referring to the actual postcards and paper copies of items he sent to Defendants, Plaintiff does not allege that Defendants were not intended to take the beneficial interest of the postcards and other submissions or that Defendants obtained the materials wrongfully. To the contrary, Plaintiff alleges that he voluntarily submitted materials to Defendants' employees on a number of occasions in the hopes of working with them in some way. See, e.g., id. ¶¶ 30, 43, 53, 55, 63, 69, 73, 74, 85. Plaintiff argues that the "protected materials" were never "refused in person, via email or returned to the sender via [US] postal mail." Opp'n at 40. However, Plaintiff does not allege any duty on Defendants' part to return the submissions sent to them. Such a duty would be unreasonable given the presumably large expense of returning submissions to aspiring actors, producers, singers, and writers that send materials to studios or record companies.

Therefore, the Court finds that Plaintiff cannot state a claim for a resulting or constructive trust.[9]

The First Cause of Action is dismissed with leave to amend. However, an amended claim that relies on Defendants' alleged subsequent use of Plaintiff's intellectual property would be preempted by the Copyright Act, as explained above, and therefore Defendants would be entitled to judgment on the pleadings on such a claim.

**2. Felony Copyright Infringement (Second Cause of Action)**

There is no private right of action for felony copyright infringement. Liqiang Wei v. Jiazhong Sun, No. 18-CV-02136-MEJ, 2018 WL 1833897, at *3 (N.D. Cal. Apr. 18, 2018), report and recommendation adopted, No. 18-CV-02136-YGR, 2018 WL 4378760 (N.D. Cal. May 15, 2018) ("Neither of these criminal copyright statutes [18 U.S.C. § 2319 and 17 U.S.C. § 506(a)] entails a private right of action allowing Plaintiff to enforce these provisions.").

[9] Although not alleged in the FAC, Plaintiff claims that Defendant Rob Hardy "breached plaintiff's confidence by sharing plaintiff's trade secret without his permission." Opp'n at 40. Even if true, this would not state a claim for a resulting or constructive trust. Moreover, Plaintiff does not allege with whom Hardy improperly shared the Works. Plaintiff intentionally shared his Works with Hardy because he "thought Rob Hardy would be the best producer to help aid the development and production of Tunnel Vision." FAC ¶ 73. That Hardy may have shared the Works with others who would assist in any such development and production is exactly what Plaintiff wanted him to do. Plaintiff's complaint is not that Hardy shared the Works, but that Hardy decided not to work with Plaintiff in creating the Series. For these reasons, the Court rejects Plaintiff's request to add a claim for "breach of confidence," Opp'n at 45, because it would be futile.

Plaintiff appears to argue that there is an exception where the felony copyright infringement is related to a conspiracy. See Opp'n at 40-41 (citing Stewart v. Wachowski, 574 F. Supp. 2d 1074, 1110 (C.D. Cal. 2005) and Kevin Barry Fine Art Assocs. v. Ken Gangbar Studio, Inc., 391 F. Supp. 3d 959, 970 (N.D. Cal. 2019)). However, in neither of those cases was Plaintiff entitled to bring a separate claim for felony copyright infringement. Rather, the copyright infringement was permitted to serve as a predicate act in support of a Racketeer Influenced and Corrupt Organizations Act (RICO) claim. Therefore, Plaintiff cannot state a claim for felony copyright infringement.

The Second Cause of Action is dismissed without leave to amend, as no additional facts could be alleged to state a claim for criminal copyright infringement.

**3. Discrimination (Fifth Cause of Action)**

Plaintiff claims he was discriminated against in violation of 42 U.S.C. § 1981(b). FAC ¶ 163. The basis for this claim is that Defendants "pilfer[ed] the workload of plaintiff, excluding him as the true author and replacing him with African American creators." Id. Defendants' conduct purportedly "deprives plaintiff from enjoying exclusive rights of protected expression." Id. ¶ 164; see also id. ¶ 165 ("By the acts, plaintiff was and continues to be the subject of strategic and repeated corporate trickery through violations of the Copyright Act of 1976."). This appears simply to restate Plaintiff's copyright infringement claim.

Outside of the employment context, a plaintiff asserting a claim under Section 1981 must show that "(1) [he] is a member of a protected class, (2) [he] attempted to contract for certain services, and (3) [he] was denied the right to contract for those services." Lindsey v. SLT Los Angeles, LLC, 447 F.3d 1138, 1145 (9th Cir. 2006). Plaintiff alleges that after Defendants viewed his

work they "chose to discriminate by contracting with white citizens who'd choose which African Americans they'd hire to develop a 'derivate' according to their own taste." FAC ¶ 160. Plaintiff further alleges that "the primary reason the defendants . . . did not contract with plaintiff was because he is a young African American male who's not affiliated with any of the [D]efendant[s'] recognized 'social clubs.'" Id. ¶ 161.

Plaintiff has not alleged that he attempted to contract for any services. To the contrary, Plaintiff complains that Defendants chose not to contract with Plaintiff for his services or pay him for his ideas. That does not state a claim under Section 1981.

The Fifth Cause of Action is dismissed with leave to amend. However, an amended claim that relies on Defendants' alleged subsequent use of Plaintiff's intellectual property would be preempted by the Copyright Act, as explained above, and therefore Defendants would be entitled to judgment on the pleadings on such a claim.

**4. Racketeering (Seventh Cause of Action)**

To allege a RICO claim, a plaintiff must allege "a pattern of racketeering activity." 18 U.S.C. § 1962(a). Racketeering activity "encompass dozens of state and federal offenses, known in RICO parlance as predicates." RJR Nabisco, Inc. v. European Cmty., 136 S. Ct. 2090, 2096 (2016). There is a pattern of racketeering activity where there is "a series of related predicates that together demonstrate the existence or threat of continued criminal activity." Id. at 2096-97.

Plaintiff cites a number of statutes Defendants have purportedly violated. First, Plaintiff alleges that Defendants violated 18 U.S.C. §§ 371, 1001(a), 1519, and 1622 by "misrepresent[ing] facts of 'original' and 'intentional' ownership of *All American* . . . as a 'conspiracy' to obstructing justice." FAC ¶

184; see also id. ¶¶ 185-87.[10] However, none of these provisions constitutes a predicate RICO act. See 18 U.S.C. § 1961(1).

Second, Plaintiff alleges that Defendants failed to include "every author . . . on the copyright registration that deals with their creative input under 17 U.S.C. [§] 201, the willful omission and concealment of that disclosure . . . is a violation of federal public policies and discrimination for commercial purposes." FAC ¶ 189. The cited section, 17 U.S.C. § 201, does not constitute a predicate RICO act, see 18 U.S.C. § 1961(1), and the Court will not guess which "federal public policies" are alleged to constitute

---

[10] Plaintiff' cites to Aalmuhammed v. Lee, 202 F.3d 1227 (9th Cir. 2000) a number of times, apparently to challenge the fact that Defendants made Defendant Spencer Paysinger a producer, instead of a consultant, so that he could be considered an author of the Series. See FAC ¶¶ 184-88. But Plaintiff misunderstands the holding of that case. In Aalmuhammed, Denzel Washington asked the plaintiff to "assist him in his preparation for the starring role" as Malcom X. 202 F.3d at 1229. The plaintiff would review the scripts and suggest revisions, but did not have a written contract. Id. at 1229-30. The plaintiff "asked for a writing credit as a co-writer of the film, but was turned down." Id. at 1230. The movie credits listed the plaintiff as an "Islamic Technical Consultant." Id. The plaintiff sued seeking credit as a co-author. Id. The Ninth Circuit noted that "[t]he best objective manifestation of a shared intent, of course, is a contract saying that the parties intend to be or not to be co-authors." Id. at 1235. However, because a contract did not exist, the court looked at whether the plaintiff had control over the work (he did not) and whether the parties had other objective manifestations of an intent to be co-authors (they did not). Id. There is nothing in this case prohibiting consultants from being listed as co-authors of a copyrighted work. The court merely looked at the parties' intent to determine whether there was a genuine dispute that plaintiff was not a co-author. Plaintiff does not otherwise explain how changing Paysinger's role from consultant to producer violates any criminal law.

predicate RICO acts.[11] To the extent Plaintiff is asserting that the RICO predicate is criminal copyright infringement, 17 U.S.C. § 506; 18 U.S.C. § 2319, Plaintiff has failed to allege that there was "a series of related predicates" as required to assert a RICO claim. Further, Plaintiff's vague allegations that Defendants committed criminal copyright infringement by "conceal[ing] plaintiff as the true author" of the "90% derivate work," FAC ¶¶ 132-33, fails as a matter of law. See Smith, 2019 WL 6998666 at *5 ("Because the creator of a derivative work only has a copyright in the original aspects of the derivative work, . . . there is no basis in the Copyright Act to declare Plaintiffs authors of the allegedly derivative or infringing work."). Similarly, because the Court has found that Defendants did not infringe Plaintiff's copyright as a matter of law, a claim based on willful copyright infringement cannot survive.

Third, Plaintiff cites a number of prior cases he presumably contends establish a pattern of racketeering activity:

- Plaintiff claims that "Warner Brother's 'settled' a racketeering and money laundering case" in March 2018 right before implementing a plan for expanding internationally. FAC ¶ 191 (citing Brittle v. Time Warner, Inc., Case No. 3:16-cv-00908 (E.D. Va)). However, Brittle did not concern racketeering and money laundering. The plaintiffs alleged copyright infringement, trespass to chattels, statutory business conspiracy, conversion, tortious interference with contract, injunction, and violation of the Lanham Act.

[11] In opposition, Plaintiff raises a number of new alleged violations of purported RICO predicates without factual basis or citation to the FAC. Opp'n at 44. A complaint cannot be amended via brief and Plaintiff has not indicated he could allege facts in support of any of these alleged violations.

The district court dismissed the trespass to chattels and conversation claims as preempted, dismissed the Lanham Act claim for failing to allege injury, and the remaining claims survived the motion to dismiss. The parties eventually settled. Brittle, Dkt. 66.

- Plaintiff also cites another case "for copyright infringement" which purportedly resulted in a "confidential settlement for 'ripping off' the overall expression of [the plaintiff's works] in violation of 17 U.S.C[.] § 201, 506(e), 18 U.S.C. §§ 371, 1831, 1832 . . . , and section 2319." FAC ¶ 193 (citing United Federation of Churches LLC d/b/a The Satanic Temple v. Netflix, Inc., Case No. 1:18-cv-10372 (S.D.N.Y)). However, that complaint did not assert violations of those provisions; rather it brought claims for "copyright infringement, false designation of origin[], false description; and forbidden dilution under trademark dilution under 15 USC § 1125, and Injury to Business reputation dilution under New York General Business Law § 360-l." Satanic Temple, 2018 WL 5839467. The case was voluntarily dismissed a few weeks later. Id., Dkts. 14, 16.

- Plaintiff claims that another case asserted "felony copyright infringement in violation of The Digital Millennium Copyright Act of 1998." FAC ¶ 194 (citing Bledsoe v. CBS Television Network, No. 2:18-CV-3043-JAM-EFB PS (E.D. Cal.)). However, that case alleged only "copyright infringement," not felony copyright infringement. Bledsoe, Dkt. 1. Moreover, the action was dismissed for failing to state a copyright infringement claim. Bledsoe, 2019 WL 5188972, at *2 (E.D. Cal. Oct. 15, 2019). The Second Amended

Complaint added claims for RICO violations based on the alleged hijacking of plaintiff's private Facebook page. Id., Dkt. 6. No similar allegations are asserted here.

- Plaintiff cites to a case "against Warner Brother's for racketeering, fraud of bankruptcy court, fraud against the United States Government and felony copyright." FAC ¶ 195 (citing Stewart v. Cameron, Case No. :18-cv-02351-GMN-GWF (D. Nev.)). In that case, the Court dismissed the action due to the plaintiff's failure to oppose a motion to dismiss and the district court cautioned the plaintiff that if she "continued harassing or frivolous behavior" she might be declared a vexatious litigant in the future. Stewart, Dkt. 49.

- Plaintiff also refers to a shareholder suit seeking to inspect the books and records of CBS related to the alleged wrongdoing of former CEO Leslie Moonves. FAC ¶ 196 (citing Graulich v. CBS Corporation, Case No. 2019-0183 (Del.Ch.)). Alleged sexual misconduct is not related to the claims brought here. In any event, that case was voluntarily dismissed. Graulich, 2019 WL 2060343, at *1 (Del.Ch. May 08, 2019).

Given that all of these cases settled or were dismissed, it is not clear how any of them establishes a pattern of racketeering activity. Further, Plaintiff fails to allege how Defendants' actions in defending themselves against various lawsuits is a RICO predicate, or that those lawsuits are "related" to the alleged RICO predicates claimed here.

Finally, Plaintiff lists random facts, but does not allege that any of those facts constitutes a predicate RICO violation. FAC ¶ 197. For example, Plaintiff contends that Defendants'

settlement of copyright infringement actions is "an admission of guilt." Id. Plaintiff is wrong. Neither lawsuits nor settlements are evidence of guilt of a predicate crime. Similarly, that three copyright infringement lawsuits were filed against certain Defendants in 2019 is not evidence of a predicate RICO act.

The Seventh Cause of Action is dismissed with leave to amend. However, an amended claim that relies on Defendants' alleged subsequent use of Plaintiff's intellectual property would be preempted by the Copyright Act, as explained above, and therefore Defendants would be entitled to judgment on the pleadings on such a claim.

## IV. CONCLUSION

Defendants' motion for judgment on the pleadings is GRANTED as to the Second, Third, Fourth, and Sixth Causes of Action. Plaintiff's First, Fifth, and Seventh Causes of Action are DISMISSED with leave to amend. An amended complaint may be filed and served no later than March 18, 2020. Failure to file by that date will waive the right to do so. The Court does not grant leave to add new defendants or new claims, or to include any claims based on the copyrights at issue in this motion. Leave to add new defendants or new claims must be sought by a separate, properly noticed motion.

The Court also informs Plaintiff that he cannot refer to any prior pleadings in order to make an amended complaint complete. Local Rule 15-2 requires that an amended complaint be "complete including exhibits" and "shall not refer to the prior, superseded pleading." Accordingly, once plaintiff files an amended complaint, the original no longer serves any function in the case. Finally, the Court cautions Plaintiff that failure to comply with the Federal Rules of Civil Procedure, this Court's Local Rules, or any Court order may result in sanctions. See L.R. 83-7 ("The violation of or

failure to conform to any of these Local Rules may subject the offending party or counsel to . . . sanctions as the Court may deem appropriate under the circumstances.").

IT IS SO ORDERED.

Date: February 18, 2020

Dale S. Fischer
United States District Judge